**JUDGE KEENAN**

# 13 CV 4650

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LE METIER BEAUTY INVESTMENT PARTNERS LLC, AND UNATTAINABLE BEAUTY, LLC<br><br>                        Plaintiffs,<br><br>           v.<br><br>METIER TRIBECA, LLC, AND RICHARD BLANCH<br><br>                      Defendants. | Civil Action No.<br><br><br>Jury Trial Demanded<br> |

---

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND FOR COMMON LAW FRAUD, BREACH OF CONTRACT, AND BREACH OF FIDUCIARY DUTY

---

Kevin J. Leichter
10203 Santa Monica Boulevard, 4th Floor
Los Angeles, California 90067
Tel: (310) 229-0000

Vincent R. Cappucci
Evan T. Raciti
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue
26th Floor West
New York, New York 10017
Tel: (212) 894-7200

*Attorneys for Plaintiffs*

EC.52551.1

Plaintiffs Le Metier Beauty Investment Partners LLC ("LMBIP") and Unattainable Beauty, LLC ("UB") (collectively, "Plaintiffs") bring this action to recover for material losses incurred as a result of the wrongdoing of Defendants Metier Tribeca, LLC ("Metier" or the "Company"), and Metier's then-Chief Executive Officer, Richard Blanch ("Blanch") (collectively, "Defendants") in connection with Plaintiffs' purchase and acquisition of equity interests in the Company through private placements in October 2012.

Plaintiffs base this complaint upon personal knowledge as to themselves and upon information and belief as to all others. Plaintiffs' information and belief are based upon, among other things, an extensive investigation conducted by and through their attorneys and contracted financial professionals, which included, *inter alia*, a review and analysis of:

- Available portions of the Company's books and records;
- Written and oral communications between Defendants and Third Parties;
- Direct written and oral communications between Plaintiffs and Defendants;
- Public filings with the U.S. Securities and Exchange Commission by the Company; and
- Other publicly available information concerning Defendants.

Plaintiffs' investigation into the factual allegations contained herein is continuing, and Defendants uniquely posses many of the facts supporting Plaintiffs' allegations and/or such facts are exclusively within the Defendants' custody and control. Plaintiffs believe further substantial evidentiary support exists for the allegations contained herein and will be obtained after a reasonable opportunity for discovery.

EC.52551.1

## I.  INTRODUCTION

1.      This action arises out of multiple acts of fraud, breaches of contract, and breaches of fiduciary duty committed by Defendants in connection with Plaintiffs' purchases of equity interests in Metier in October 2012.  As detailed herein, Plaintiffs invested approximately $5 million in the Company in reliance on Defendants' explicit representations and contractual guarantees that the investment proceeds would not be used to repay existing Company debt (with a single scheduled exception) and would solely be used to fund the working capital requirements of the Company.  In deciding to invest, Plaintiffs also relied on, *inter alia*, Defendants' written and oral representations concerning the number of purchase orders already received by the Company, and the Company's ability to fulfill these orders upon receipt of Plaintiffs' investment funds.  Not until January 2013, when Plaintiffs retained a third-party financial expert to analyze the Company's books and records, did Plaintiffs discover that Defendants' representations and guarantees were blatant lies made for the express purpose of inducing investments in the Company.

2.      As further detailed below, Metier's accounting records reveal that Defendant Blanch wired hundreds of thousands of dollars from the Company's accounts to his personal bank account, and to the bank accounts of other insiders, only hours after receiving Plaintiffs' investment monies.  These transfers were made in direct violation of Defendants' explicit contractual promises not to use Plaintiffs' investment for any purpose other than as working capital.  In an ill-conceived effort to conceal his theft, Defendant Blanch then altered the books and records of the Company to post backdated amounts due.  When later confronted about the missing funds, Defendant Blanch claimed the monies were due to himself and his cohorts, and that they had not been previously disclosed due to an "accounting error."

3

3.     Defendants' wrongdoing was not limited to their false promises concerning the intended use of Plaintiffs' investment funds.  Prior to Plaintiffs' decision to invest, Defendants also made a series of materially false and misleading statements and representations relating to the volume of the Company's prior and projected orders and sales.  Specifically, Defendants claimed to have received a significant number of product orders that never actually existed.  By providing materially false and misleading orders and sales information to Plaintiffs, Defendants artificially inflated the value and attractiveness of investing in the Company.  Not surprisingly, Plaintiffs justifiably relied upon this materially false and misleading sales information in deciding whether to invest in Metier, and in calculating the value of such an investment.

4.     After the first hints of Defendants' fraud came to light, Plaintiffs sought to review the books and records of the Company in order to investigate what happened to the invested monies, as was their right.  Shockingly, Plaintiffs' investigation revealed that Defendants had altered the Company's records in a desperate attempt to justify their wrongful actions, including, *inter alia*, creating backdated entries purporting to show balances owed to Defendant Blanch and other insiders.

5.     During this time period, Defendant Blanch began the process of stacking the Company's Board of Directors, using his position to remove two independent directors and replace them with individuals presumably loyal to Defendant Blanch.  Defendants also employed Company resources, including the Company's outside general counsel, to assist in carrying out their fraud.

6.     After discovering that the Company was in dire need of working capital as a result of Defendants' misuse of the original investment funds, Plaintiffs approved the Company's request to take out a loan from a third party to support its continuing operations.  Plaintiffs'

4

approval was expressly conditioned on Plaintiffs and a third investor having absolute oversight and control over the use of the borrowed monies, in order to prevent further theft and misuse of Company funds.  The approval was also conditioned on the Company's outside counsel certifying to Plaintiffs that the new lender had received proper disclosures.  Yet, Defendants proceeded to close the loan without sharing the operative loan agreement and without fulfilling the conditions of Plaintiff's consent.  Today, Defendants purport to be in control of the proceeds of this loan and purport to have the unrestricted right to use the proceeds as they will.

7.      Plaintiffs have suffered millions of dollars in damages as a result of Defendants' acts and omissions, and Defendants' most recent actions, particularly with respect to their misconduct in securing the above-referenced third party loan, raise the very real specter of further and continuing harm.  Accordingly, Plaintiffs are entitled to damages and injunctive relief, and other remedies as this Court deems appropriate, to provide redress for the wrongs committed against them and to provide protection from further injury.

8.      Based on the facts alleged herein, Defendants violated Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b) and § 78t(a), and SEC Rule 10b-5 promulgated thereunder, and are also liable for common law fraud, fraudulent inducement, breach of fiduciary duty, and breach of contract.

## II.   JURISDICTION AND VENUE

9.      This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and § 78t(a), and SEC Rule 10b-5 promulgated thereunder, as well as under common law fraud, breach of fiduciary duty, and breach of contract.

5

10.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and 28 U.S.C. § 1331 and § 1367.

11.    Venue is proper in this District pursuant to the provisions of Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  At all relevant times, Defendants' principal place of business was located at 24 West 40th Street, 10th Floor, New York, NY 10018, and Defendants transact substantial and ongoing business within the District.  Substantially all of the acts, omissions, and transactions giving rise to the violations of law complained of herein, including the preparation and transmission of false and misleading information, occurred in the District.

III.    **PARTIES**

A.    **Plaintiffs**

12.    Plaintiff Le Metier Beauty Investment Partners LLC is a limited liability company organized under the laws of the State of Delaware and is not a citizen of New York.  LMBIP is a member of the Company.

13.    Plaintiff Unattainable Beauty, LLC is a limited liability company organized under the laws of the State of Delaware.  UB is a member of the Company.

B.    **Defendants**

14.    Defendant Metier Tribeca, LLC ("Metier" or the "Company") is a limited liability company organized under the laws of the State of New York.  Metier is engaged in the manufacture, marketing, and sales of luxury cosmetics.

6

15.     Defendant Richard Blanch ("Blanch") is an individual and a citizen and resident of the State of New York.  He is presently, and was at all relevant times, a Manager of the Company and purports to be its Chief Executive Officer.  He is a member of the Company.

## IV.   FACTUAL BACKGROUND

16.     Commencing in or about August 2012, and continuing through October 31, 2012, Defendants and Plaintiffs engaged in a series of discussions regarding the possibility of Plaintiffs making equity investments in Metier.  During this time period, UB was a lender to the Company, having in or about February 2012 extended credit to the Company in the aggregate principal amount of $1.85 million.  LMBIP had no previous relationship with the Company.

17.     By the summer of 2012, Defendants represented to Plaintiffs that the monies advanced by UB earlier that year had already run out because a significant portion of UB's initial investment had been used to pay old indebtedness of the Company.  Defendants represented to Plaintiffs that, with several million dollars in additional working capital, the Company would have the means to fulfill orders in hand, and would be able to meet the objectives of its business plan.  Although Plaintiffs expressed concerns about making a new investment in the Company upon learning of the rapidity with which UB's earlier loan was spent, they agreed to enter new investment negotiations in reliance upon Defendants' explicit assurances that the Company had already received significant purchase orders which could only be filled with an injection of new capital.

18.     During the investment negotiations, Defendants provided Plaintiffs with a schedule setting forth the proposed uses of the investment proceeds.  As originally drafted, this document indicated that a significant portion of Plaintiffs' investment would be used to pay existing debt, including, *inter alia*, debt owed to Defendant Blanch and other insiders.  Plaintiffs

7

unequivocally rejected these proposed uses of their investment, and expressly indicated that they would not invest in the Company if their contributions would be used to pay aged debt, including, *inter alia,* debt owed to Defendant Blanch and other insiders.

19.     In order to induce Plaintiffs to invest, Defendant Blanch agreed to accept equity in the Company in full satisfaction of the above-referenced debt owed to him.  Defendants and Plaintiffs further agreed that the investment monies would only be used to fund the Company's working capital requirements and would not be used to pay Company insiders or any preexisting debt beyond a single scheduled exception.

20.     Specifically, as set forth in Section 1.6 of the LLC Company [sic] Membership Interest Purchase Agreement (the "LMBIP Agreement") pursuant to which Plaintiff LMBIP invested $1.8 million in Metier, Defendants represented to LMBIP that the Company would "use the proceeds from the sale of the Membership Interests *solely to fund the working capital requirements* of the Company and/or to retire debt *set forth in Exhibit 1.6, such debt not to exceed $350,000.  Such proceeds may not be used for any other purpose unless otherwise agreed to by buyer.*"[1] (emphasis added).

21.     In the parallel LLC Company [sic] Membership Interest Purchase Agreement pursuant to which Plaintiff UB invested $2,175,070 in Metier (the "UB Agreement"), the same representation is made, *verbatim.*[2]  The UB Agreement also includes the following promise: "*Unless scheduled in section 1.6 for retirement, no other existing debt shall be paid prior to its Maturity Date or December 31, 2013, whichever is later.*" (emphasis added).

---

[1] Exhibit 1.6 of the LMBIP agreement indicates a "Promissory Note" to John Keller in the principal sum of "$300,000.00," due February 3, 2013 (the "John Keller Debt").  This was the only debt that the agreement allowed the Company to retire using LMBIP's investment funds.
[2] Exhibit 1.6 of the UB Agreement is likewise identical to Exhibit 1.6 of the LMBIP agreement.

EC.52551.1

22.     All of the above contractual statements were materially false and misleading and were made in violation of Section 10(b) of the Exchange Act.  At the time these statements were made, Defendants had no intention of using the investment proceeds solely for the purposes permitted by the LMBIP and UB Agreements: (i) to repay the scheduled John Keller Debt; and (ii) to fund the Company's working capital requirements.  Instead, Defendants intended to divert a significant portion of the proceeds directly to Defendant Blanch and other insiders, and to pay aged Company debt, as set forth more fully herein.

23.     Defendants also repeatedly told Plaintiffs that the funds would only be used for working capital, orally and in writing, throughout the negotiation period. For example, one e-mail from Defendant Blanch to LMBIP, dated October 22, 2012, read in part: "[LMBIP's] money will assist us in ensuring we are in stock on inventory and able to meet order requirements." Further, in the week prior to the October 31, 2012 closing, Defendants expressly and explicitly assured Plaintiffs that the invested funds would be used to fund growth and not to pay back bills. These statements were materially false and misleading, in violation of Section 10(b) of the Exchange Act, for substantially the same reasons discussed in ¶ 21 above.

24.     In addition to the foregoing, Defendant Blanch made specific misrepresentations regarding existing and projected orders and sales for the balance of the year 2012.  These projections, coming from the CEO of the Company, were reasonably relied upon by Plaintiffs because Defendant Blanch had unique access to information concerning the Company's business, including its current and projected orders and its ability to meet them.

25.     Specifically, in or about August 2012, Defendant Blanch told Plaintiffs that projected sales for 2012 would be approximately $12 million.  Once it became apparent, upon Plaintiffs' review of the books and records provided for pre-investment due diligence, that this

9

sales total was unlikely to be achieved, Plaintiffs advised Defendants that they would not proceed with their investments.

26.     On October 22, 2012, Defendant Blanch, desperate to close the investment transactions, and faced with concerns from the investors regarding sales, represented in an e-mail to UB that the Company would ship $8.5 million by year-end 2012: ***"The revenue numbers are entirely based on the inventory we have in house and our ability to ship out orders.*** We will have ***well over $10MM in orders*** [in 2012], but most likely ***will ship around $8.5MM***. It is disappointing, but we have delayed some orders due to inventory – saving the orders for Q1/Q2 2013. . . . Instead, we have geared up to do big volume in Q1 and Q2 2013. We will hit the $15MM we have projected in 2013. We most likely will exceed it." (emphasis added).

27.     Defendant Blanch further represented that the books and records of the Company were being "reconciled" and therefore the latest sales figures, which he assured Plaintiffs were as represented, could not be provided for immediate review. In an October 4, 2012 e-mail, Defendant Blanch stated that "[t]he September books will not be closed until the end of the month [of October] – so you will need to wait until post investment, likely, for those numbers." In that same e-mail, after disclaiming an ability to provide the books themselves, Defendant Blanch asserted that "[w]e should be around $6.2MM as of 10/31/12 on revenue. ***We have $1.5MM in November orders ahead of us*** . . . holiday product. So we are chasing December orders now and hope to get some new doors open and push $9MM on the year" (emphasis added).

28.     However, as Plaintiffs later learned, Defendant Blanch's representations were clearly impossible given the actual volume of purchase orders received by the Company at the time – a fact that Defendant Blanch had known all along. Indeed, the Company did not have

EC.52551.1

"$1.5MM in November orders" – in fact, the Company's purchase orders barely totaled $1.6 million for the entire fourth quarter. Worse, Defendant Blanch's representation that he could not give Plaintiffs up-to-date sales figures "until post investment" was also a lie. In fact, as Plaintiffs later learned, Defendant Blanch continuously received bi-weekly automated reports indicating current orders, sales, and inventory levels.

29.     By fraudulently inflating orders and sales totals, critical elements in the calculation of the Company's enterprise value and, consequently, equity share price, Defendants sought to induce Plaintiffs to pay more for their equity interests in Metier than they were actually worth. By claiming the existence of orders in hand that would become sales upon shipment, and by falsely representing and warranting that the investment proceeds were needed and would be used for working capital (*i.e.*, to purchase components and manufacture inventory), Defendants sought to persuade Plaintiffs that their investment would "***assist [the Company] in ensuring we are in stock on inventory and able to meet order requirements,***" and consequently, lead to an increase in the Company's enterprise value. (emphasis added).

30.     These statements concerning orders and sales were also materially false and misleading because they omitted the critical fact that, with or without the aid of Plaintiffs' investment, the Company would be unable to meet even its actual, un-inflated, purchase order total. On October 22, 2012, when Defendant Blanch claimed that the Company "had $1.2MM in November orders ahead," the Company had insufficient inventory to fill even the Company's actual orders, and it was already too late in the year to finish producing more for November delivery.

11

31.     These materially false and misleading statements were part of Defendants'
ongoing fraud, and were made for the improper and fraudulent purpose of inducing Plaintiffs to
invest under false pretenses.

32.     On October 31, 2012, in justifiable reliance upon Defendants' material
misrepresentations, UB purchased a 14.53% interest in Metier for $2,175,070, and LMBIP
purchased a 10% interest in Metier for $1.8 million.  Also in justifiable reliance upon
Defendants' material misrepresentations, LMBIP simultaneously acquired an additional 12%
equity interest in the Company for $1.25 million from a third party member of the firm.

33.     On October 31, 2012, the Company received a wire from LMBIP in the amount of
$1,800,000.  Within 24 hours, Defendant Blanch wired himself $70,000 from the Company's
account – an account that had had a negative balance on October 30, 2012, the day before
Plaintiffs' investment funds were received.  At the same time, an additional $125,000 was wired
to two other insiders of the Company, Gerard Mastellon and Joanna Austin, amounts that were
later denoted on the books as back salary.  Attorney Michael Steger was also given over $30,000
that same day.  In total, nearly $250,000 of Plaintiffs' investment was wired out of the
Company's account and into accounts owned and/or controlled by Company insiders within 24
hours after the investment proceeds arrived.

34.     The unlawful outflow of funds continued in the months following.  In November
and December 2012, the 60-day period immediately following Plaintiffs' investment, Defendant
Blanch took "reimbursements" totaling $145,000, which he structured into four smaller, less
noticeable self-directed payments, and which he supported with contemporaneous back-dated

12

book entries.[3]  This purported $145,000 "debt" was not disclosed in the Investment Agreements or reflected as a payable in the books and records that were shown to Plaintiffs prior to their investment in the Company.

35.     Despite Defendants' repeated written and oral representations and guarantees to the contrary, Plaintiffs' investment funds were not used for working capital.  By January 2013, 83% of the $1.8 million invested by LMBIP on October 31, 2012 had been used to pay back salary, current salary, and expense reimbursements to Defendants and other insiders, pay aged debt to attorneys, accountants, and consultants, pay aged and current debt for rent and insurance, pay aged debt for a warehouse, and pay an aged royalty obligation.

36.     Thus, only 17% of the LMBIP investor money was left to provide funding to suppliers in order to produce additional inventory and to support other core capital functions, the exclusive purposes to which Defendants contracted to put those funds.

37.     In December 2012, Defendant Blanch announced to Plaintiffs that their investment proceeds had been exhausted, and that additional financing was needed to support the Company's business, without which the Company would be unable to meet its commitments. Incredibly, Defendant Blanch advised Plaintiffs that the Company's situation was the result of a lack of working capital to fund inventory and fill orders – the exact deficiency the investment proceeds were supposed to resolve.  In a December 21, 2012 e-mail to Plaintiffs revealing that the investment money was exhausted, Defendant Blanch also admitted that the Company "did not ship $2MM in orders this year . . . . We under shipped customers . . . and we lost much needed revenue.  We under shipped because we did not have the inventory."

---

[3] This was part of an ongoing pattern: on February 24, 2012 – the very day that UB made its initial debt investment, (discussed in ¶¶ 16-17, *supra*, and not at issue here) – Richard Blanch covertly paid himself $114,438.27 from the proceeds.

EC.52551.1

38.     This revelation came as a shock to Plaintiffs given Defendants' written and oral representations concerning the Company's financial condition and Defendant Metier's contractual promises that the investment funds would only be used to satisfy the Company's working capital requirements.  It was also a shock given that Defendant Blanch had specifically promised Plaintiffs, on or about October 24, 2012, that he "absolutely guaranteed" that the invested funds would be sufficient to carry the Company forward through the first quarter of 2014.

39.     As a result Defendants' wrongdoing, Plaintiffs have suffered substantial losses entitling them to relief in an amount and form to be determined at trial.

## V.     CLAIMS FOR RELIEF

### COUNT I:

### Violation of Section 10(b) of the Exchange Act And Rule 10b-5 Promulgated Thereunder, Against All Defendants

40.     Plaintiffs repeat and reallege all the allegations set forth above as if fully set forth herein.

41.     As detailed more particularly above, Defendants used the means and instrumentalities of interstate commerce, the mails, wires, and the internet to make materially false and misleading statements and omissions of material fact to deceive Plaintiffs, in order to induce Plaintiffs to purchase certain membership interests in the Company, and to do so at an unfair and inflated price, all in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  All Defendants are sued as primary participants in the wrongful conduct alleged herein.

14

42.    These false and misleading statements and omissions of material fact, detailed more fully above, included, *inter alia*,

    a.    Misrepresenting that the funds invested by Plaintiffs in the Company would be used solely to fund the working capital requirements of the Company and/or to retire specific pre-existing debt, such debt not to exceed $350,000.  In reality, Defendant Blanch transferred over 80% of Plaintiffs' investment to himself and to certain confederates and fellow insiders, or used it to pay aged and current debt to attorneys, accountants, and consultants, aged and current debt for rent and insurance, aged debt for a warehouse, and an aged royalty obligation; and

    b.    Misrepresenting to Plaintiffs the current orders and projected sales totals of the Company; more specifically, *inter alia*, representing to Plaintiffs that the Company had $1.5 million in orders in-hand for November 2012.  However, as Defendants knew or reasonably should have known, these orders did not exist, and such sales were in any event impossible given the inventory available to the Company at that time.

43.    Defendants were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and knew or recklessly disregarded the falsity of these statements made to Plaintiffs in connection with Plaintiffs' investment in the Company.

44.    Defendants acted with scienter in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts to Plaintiffs, even though such facts were readily available to Defendants.  Defendants' material misrepresentations

15

EC.52551.1

and omissions were made knowingly and/or recklessly, and for the purpose and effect of inducing Plaintiffs to invest millions of dollars in the Company, all the while concealing the Company's true financial condition and Defendants' intent to misappropriate the proceeds of Plaintiffs' investments.

45.     At the time of the material misrepresentations and omissions alleged herein, Plaintiffs were ignorant of their falsity and justifiably relied upon them in making their decisions to invest in the Company.  Plaintiffs would not have purchased membership interests in the Company had they known the truth of Defendants' material misrepresentations and omissions. In addition, Plaintiffs would not have taken other actions associated with the transaction, including the execution of various documents related to the transaction, the purchase of an additional equity interest from a third party member of the Company, the expenditure of monies on professional fees, and other actions induced by Defendants' misrepresentations and false promises.

46.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered material damages in connection with their transactions to purchase membership interests in the Company.

## COUNT II:

### Violation of Section 20(a) of the Exchange Act Against Defendant Blanch

47.  -  Plaintiffs repeat and reallege all the allegations set forth above as if fully set forth herein.

48.     At all relevant times, Defendant Blanch was a Manager, member, and senior executive of the Company, and hence was privy to confidential and proprietary information

16

EC.52551.1

concerning every aspect of the Company. In this regard, Defendant Blanch had regular access to non-public information about the Company's business, operations, performance, prospects, and financial condition through access to internal Company documents and information, conversations and connections with other employees and officers of the Company, attendance at management meetings, and reports and other information provided to him in connection therewith.

49.     Defendant Blanch acted as a controlling person of the Company within the meaning of Section 20(a) of the Securities Exchange Act of 1934, as alleged herein. By virtue of his high-level position, participation in and/or awareness of the Company's operations, Defendant Blanch had the power to influence and control, and did indeed influence and control, the decision-making of the Company, including the content and dissemination of the various materially false and misleading misrepresentations and omissions relied upon by Plaintiffs in their decision to invest in the Company. In this regard, Defendant Blanch had the ability to prevent the issuance of or correct these false and misleading communications to Plaintiffs.

50.     In particular, Defendant Blanch had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had or is presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations alleged herein. Moreover, as alleged above, Defendant Blanch affirmatively participated in the preparation and dissemination of the materially false and misleading misrepresentations and omissions to Plaintiffs, including personally making many of these misrepresentations and omissions with knowledge of or in reckless disregard of their falsity.

51.     By virtue of his position as a controlling person, and his culpable participation in the wrongdoing alleged herein, Defendant Blanch is also liable pursuant to Section 20(a) of the

17

Securities Exchange Act of 1934.  As a direct and proximate result of Defendant Blanch's wrongful conduct, Plaintiffs have suffered damages in connection with their purchases of membership interests in the Company, as alleged in more detail herein.

## COUNT III:

### Common Law Fraud Against All Defendants

52.     Plaintiffs repeat and reallege all the allegations set forth above as if fully set forth herein.

53.     As detailed more particularly above, in order to induce Plaintiffs' investment in the Company, Defendants engaged in a pattern of oral and written misrepresentations, misstatements and omissions, in order to enrich themselves at the expense of Plaintiffs. Specifically, as alleged and set forth herein, Defendants defrauded Plaintiffs through a pattern of deliberate misrepresentations, omissions, and other misconduct, including, among other things:

a.  Misrepresenting that the funds invested by Plaintiffs in the Company would be used solely to fund the working capital requirements of the Company and/or to retire specific pre-existing debt, such debt not to exceed $350,000.  In reality, Defendant Blanch transferred over 80% of Plaintiffs' investment to himself and to certain confederates and fellow insiders, or used it to pay aged and current debt to attorneys, accountants, and consultants, aged and current debt for rent and insurance, aged debt for a warehouse, and an aged royalty obligation; and

b.  Misrepresenting to Plaintiffs the current orders and projected sales totals of the Company; more specifically, *inter alia*, representing to Plaintiffs that the Company had $1.5 million in orders in-hand for November 2012.  However, as Defendants knew or reasonably should have known, these orders did not exist,

18

and such sales were in any event impossible given the inventory available to the Company at that time.

54.    Defendants knew, or recklessly disregarded, that the material misrepresentations, misstatements and omissions to Plaintiffs alleged herein were false when made.  Moreover, each such material misrepresentation or omission was material as to the true financial condition of the Company, and relevant to Plaintiffs' decision to invest in the Company.  Defendants made these material misrepresentations and omissions, or caused them to be made, with the intent that Plaintiffs would rely on these misrepresentations and omissions in making their decision to invest in the Company.

55.    By reasonably relying upon Defendants' misrepresentations and omissions, Plaintiffs have suffered damages proximately caused by Defendants' fraud in an amount to be proven at trial.

56.    Moreover, Defendants are liable for, and Plaintiffs are entitled to, punitive damages in an amount also to be determined at trial attributable to Defendants' reckless, willful, and wanton conduct carried out without regard for the legal rights of the Plaintiffs.

## COUNT IV:

### Fraudulent Inducement Against All Defendants

57.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

58.    As detailed more particularly above, in order to deceive Plaintiffs, Defendants knowingly misrepresented, *inter alia*, their total orders "in-hand," the status of current inventory, and the existence of outstanding debt obligations for the purpose of inducing Plaintiffs' entry into investment agreements with the Company.  Defendants further misrepresented to Plaintiffs

19

that the proposed investment would be sufficient to fund the Company's operations through the first quarter of 2014.

59.     Plaintiffs, reasonably relying on these misrepresentations, were induced to enter into investment agreements with the Company.   Plaintiffs suffered damages proximately caused by Defendants' fraudulent inducement and subsequent breaches of contract.

60.     Accordingly, Plaintiffs are entitled to rescission of the investment agreements, and such other relief as this Court may deem proper.

## COUNT V:

### Breach of Fiduciary Duty Against Defendant Blanch

61.     Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

62.     Defendant Blanch, by reason of his position as a Manager and Member of the Company, owed a fiduciary duty to Plaintiffs, as non-Manager Members of the Company, as defined by applicable law.

63.     Defendant Blanch breached his fiduciary duties to defendants by engaging in the conduct alleged above, including without limitation by causing the Company, in breach of its contractual obligations, to utilize the proceeds of the investment for prohibited purposes, and in contravention of the Company's contractual commitments, for the purpose of enriching himself and other insiders, and including using his position at the Company to enrich himself at the expense of Plaintiffs.

64.     Defendant Blanch's conduct in this regard was undertaken in bad faith and in wanton disregard for the rights of Plaintiffs.

EC.52551.1

65.     As a result of these breaches of fiduciary duty, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT VI:

### Breach of Contract Against Defendant Metier

66.     Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

67.     Defendant Metier entered into written contracts with Plaintiffs, as alleged above.

68.     Plaintiffs performed all covenants and conditions required to be performed on their part.

69.     As alleged above, Defendant Metier has breached its contracts with Plaintiffs by, *inter alia*, using Plaintiffs' investment funds for purposes expressly prohibited by the contracts in question, such as doling out personal handouts to insiders, and paying undisclosed aged debt.

70.     As a result of said breaches, Plaintiffs have been damaged in an amount to be determined at trial.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)     Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest as allowed by law;

(b)     Awarding punitive damages in favor of Plaintiffs against all Defendants, jointly and severally, in recognition of the knowing, willful, and wanton nature of Defendants' misconduct;

21

EC.52551.1

(c)     Awarding injunctive relief restraining Defendants from further violations and breaches of duty, mandating Defendant Blanch's return of Company property wrongfully taken, and prohibiting Defendant Blanch from using his position with the Company to further enrich himself at the expense of Plaintiffs;

(d)     Awarding rescission of the investment agreements at issue in this action and requiring Defendants to reimburse Plaintiffs for the full amount of their equity investments in the Company, including pre-judgment and post-judgment interest as allowed by law; and

(e)     Such other and further relief as the Court may deem just and proper.

## VII.    JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  July 3, 2013

By: _____
Vincent R. Cappucci
Evan T. Raciti
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, NY 10017
Tel: (212) 894-7200

Kevin J. Leichter
10203 Santa Monica Boulevard, 4th Floor
Los Angeles, California 90067
Tel: (310) 229-0000

*Attorneys for Plaintiffs*

22

EC.52498.3